UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA | * |
| | * |
| v. | * Criminal Action No. 1:19-cr-10439-IT |
| | * |
| YONATHAN VILLAR-GUERRERO, | * |
| A/K/A "JOHNNY WALKER," | * |
| | * |
| Defendant. | * |

MEMORANDUM & ORDER

March 30, 2022

TALWANI, D.J.

Defendant Yonathan Villar-Guerrero ("Villar") was charged with conspiring to distribute more than 400 grams of fentanyl in violation of 21 U.S.C. §§ 846 and 841(a)(1) and with possessing with intent to distribute more than 400 grams of fentanyl in violation of 21 U.S.C. § 841(b)(1)(A). Indictment [Doc. No. 1]. Before the court is Villar's Motion to Suppress [Doc. No. 186]. The court held a hearing on the motion on January 11, 2022, and an evidentiary hearing on February 17, 2022. For the reasons explained below, the motion is DENIED.

**I.    Background**

   A.    *DEA Investigation*

In March 2018, the Drug Enforcement Agency ("DEA") began an investigation into a suspected drug trafficking organization. Nelson Affidavit in Support of Application for Search Warrant ("Nelson Aff.") ¶ 5 [Doc. No. 191-1]. Between March and June 2018, an undercover officer made multiple controlled purchases of fentanyl from several individuals named in the Indictment [Doc. No. 1], including Bolivar Torres. Id. at ¶¶ 5-9. Through these purchases and surveillance of the sellers, law enforcement was able to connect other people, cars, and locations, including 17 Avila Road in Boston, Massachusetts, and 51 Barrows Street in Providence, Rhode

Island, to the organization. Id. at ¶¶ 5-20. Law enforcement monitored 17 Avila Road with a pole camera, which led to two drug seizures, id. at ¶ 10, and obtained warrants to track the movements of five vehicles, including a grey Chrysler, id. at ¶¶ 11-23.

    B.    *Surveillance of the Blue Maserati*

On August 21, 2019, investigators monitoring the pole camera at 17 Avila Road observed the following activity. First, a blue Maserati parked nearby for about five minutes without anyone exiting the car and then drove off. DEA Report of Investigation ("DEA Report") ¶¶ 2-3 [Doc. No. 191-2]. At 3:48 p.m., Torres arrived in the gray Chrysler, used a key to unlock the front door of 17 Avila Road, and went inside. Id. at ¶ 4. At 3:56 p.m., Torres came out and got back in the gray Chrysler. Id. at ¶ 6. At 4:01 p.m., the blue Maserati returned and parked directly behind the Chrysler. Id. at ¶ 7. Torres then got out of the Chrysler, entered the right rear passenger seat of the Maserati, and exited the car ten minutes later. Id. at ¶ 8. Shortly thereafter, both cars drove away. Id.

On August 22, 2019, at 11:22 a.m., law enforcement officers observed Torres arrive at 17 Avila Road and meet Carlos Estrella Acosta ("Estrella"), an individual believed to be associated with Torres's drug trafficking organization. Nelson Aff. ¶¶ 3, 20-22 [Doc. No. 191-1]; DEA Report ¶ 7 [Doc. No. 191-2]. Torres then used the gray Chrysler to successfully jump start a red Ford Mustang. DEA Report ¶¶ 10, 12 [Doc. No. 191-2]. Around 12:42 p.m., Torres and Acosta traveled to Canton, Massachusetts, with Torres in the grey Chrysler and Acosta in the red Mustang, followed by surveillance. Id. at ¶ 12.

Around 1:00 p.m., investigators observed the blue Maserati nearby and, for the next hour, followed the Maserati and Torres's gray Chrysler as they drove to a restaurant in Providence, Rhode Island. Id. at ¶¶ 14-17. Around 4:00 p.m., investigators realized that the Maserati was no longer in the restaurant parking lot but that the gray Chrysler remained. Id. at ¶ 18.

At 4:26 p.m., an investigator observed the Maserati parked in front of 51 Barrows Street. Id. at ¶ 19. At around 4:47 p.m., investigators observed a gray Honda Civic registered to Christopher Anderson of 51 Barrows Street arrive and park in front of the house. Id. at ¶ 20. Investigators believed that Anderson was a member of Torres's drug trafficking organization. Nelson Aff. ¶¶ 3, 11, 14-16, 20-22 [Doc. No. 191-1].

About a half an hour later, Torres, Anderson, and Villar walked out of 51 Barrows Street. DEA Report ¶ 22 [Doc. No. 191-2]. Villar was carrying a bag and got into the Maserati. Id. Torres, Villar, and Anderson all drove off. Id. at ¶¶ 22-23. DEA investigators followed Villar back to Massachusetts and requested that the Massachusetts state police conduct a stop of the Maserati. Id. at ¶ 24.

C.   *Pretext Stop*

Trooper Christopher Johnson made the stop. Arrest Report 1 [Doc. No. 191-3]. According to his testimony at the evidentiary hearing, Johnson joined the state police in October 2015 and, at the time of the stop, was assigned to uniformed patrol. Johnson testified that on August 22, 2019, he received a call from a DEA officer who described the Maserati and asked Johnson to initiate a pretext stop on the ground that the DEA officer had probable cause to believe that the car contained a large quantity of narcotics. When asked to define a pretext stop, Johnson explained that it meant that he would look for a reason to stop the car, such as a traffic infraction, so as to conduct a narcotics investigation without alerting the target the purpose of the stop. However, Johnson later testified that, based on the DEA officer's assertion that there was probable cause to stop the car, he had intended to stop Villar regardless of whether there was a pretextual reason to do so.

Johnson said that, as the car passed his location, he noticed that the front passenger window appeared to be tinted below the thirty-five percent or greater visible light transmission

level required in Massachusetts. When asked about how he made this determination, Johnson described his experience, which included making at least 100 stops on suspicion of illegal tint and then using a device called a "tint meter" to confirm his suspicions. Johnson testified that the tint meter confirmed his suspicions almost every time and that in the few instances where he fell short, the tint reading was only one or two percentage points above the legal limit.

After the Maserati passed him, Johnson activated his emergency lights and initiated a stop. Johnson testified that another officer, Trooper Robert McCarthy, arrived several seconds after Johnson stopped the Maserati to assist him. According to Johnson, as he approached the car, Villar spilled a bottle of water that he had been drinking on his face and chest. Johnson asked Villar for his license and registration, and Villar handed him a Puerto Rican license with the name Jose Eduardo Ayala-Vega. Arrest Report ¶ 2 [#191-3]. Johnson noticed that Villar's hands were shaking as he handed over his license. Id. Johnson explained the reason for the stop—the window tint—and Villar told him the car was his girlfriend's and that he was returning from checking in on her at her job at a restaurant in Cranston, Rhode Island, and was on his way back to Dorchester. Id. Johnson testified that he then used his tint meter to confirm that the window tint was in violation of Massachusetts law, although he admitted that he had made an error in not including that detail in his report.

Johnson then asked Villar if he had anything harmful or illegal in the car. Id. at ¶ 3. This caused Villar to "gulp[] hard, causing his Adams apple to shift," and Villar "then looked at the black backpack located on the front seat" before saying "no." Id. Johnson then asked Villar to step out of the Maserati and noticed he was wearing an unzipped bag over his abdomen. Id. As Johnson patted the bag, he observed a large stack of money held together with elastic. Id. Villar told Johnson there was about $2,000 in the bag and that he painted cars for work. Id. As Villar

stood next to the open car door, Johnson saw a small bag containing a brown powder substance in the pocket of the driver's side door and recognized it as consistent with heroin or fentanyl. Id. Johnson then escorted Villar to the rear of the police cruiser. Id.

During the stop, Johnson requested a license and warrant check and was advised that the license number belonged to a Carlos Figueroa, not Jose Eduardo Ayala-Vega. Id. at ¶ 4. Johnson and McCarthy then returned to the car and looked inside the backpack on the front seat where they found additional fentanyl, heroin, and cash. Id. The troopers arrested Villar, advised him of his Miranda rights, and briefly interviewed him at the barracks. Id. at ¶ 5. Villar stated that the backpack was not his and later stated that there was no fentanyl because it was all "cut." Id. at ¶¶ 5-6. Villar was charged with drug crimes in state court and cited for false identification offenses and non-transparent window tint in violation of Mass. Gen. Laws ch. 90 § 9D. Id. at ¶ 8.

## II.     Legal Standard

"A temporary detention of an individual during a traffic stop by police constitutes a seizure to which the protections of the Fourth Amendment apply." United States v. Cruz-Rivera, 14 F.4th 32, 43 (1st Cir. 2021). "An officer can stop a car if he sees a driver commit a traffic offense, even if the stop is just an excuse to investigate something else." United States v. McGregor, 650 F.3d 813, 820 (1st Cir. 2011) (citing Whren v. United States, 517 U.S. 806, 810 (1996)). A warrantless traffic stop must "not be 'unreasonable' under the circumstances." Whren, 517 U.S. 806, 810 (1996). "[T]he decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." Id. (citing Delaware v. Prouse, 440 U.S. 648, 659 (1979)). A traffic stop is intended to "address the traffic violation that warranted the stop and attend to related safety concerns" and may include "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of

insurance." Rodriguez v. United States, 575 U.S. 348, 354-55 (2015) (internal citations and quotations omitted). "These checks serve the same objective as enforcement of the traffic code: ensuring that vehicles on the road are operated safely and responsibly." Id. at 355. "However, such a stop can be extended where there is reasonable suspicion of further criminal wrongdoing." Cruz-Rivera, 14 F.4th at 43 (citing United States v. Lee, 317 F.3d 26, 33 (1st Cir. 2003)).

There is no "simple, mechanical formula" for determining what reasonable suspicion is, but "it is less than probable cause and more than a naked hunch . . . [C]ourts must gauge its presence in a commonsense, case-by-case way, taking in the whole picture." Id. (quoting McGregor, 650 F.3d at 821). "[T]he reasonableness 'determination . . . entails a measurable degree of deference to the perceptions of experienced law enforcement officers,'" id. at 43-44 (quoting United States v. Ruidíaz, 529 F.3d 25, 29 (1st Cir. 2008)), and is based on the "totality of the circumstances," Florida v. Harris, 568 U.S. 237, 244 (2013).

"The automobile exception to the Fourth Amendment's warrant requirement permits officers to 'seize and search an automobile prior to obtaining a warrant where they have probable cause to believe that the automobile contain[s] contraband.'" Cruz-Rivera, 14 F.4th at 43 (quoting United States v. Silva, 742 F.3d 1, 7 (1st Cir. 2014)) (additional citations omitted). "Police have probable cause to search 'where the known facts and circumstances are sufficient to warrant a man of reasonable prudence in the belief that contraband or evidence of a crime will be found.'" Id. (quoting Ornelas v. United States, 517 U.S. 690, 696 (1996)). "Probable cause exists when the facts and circumstances as to which police have reasonably trustworthy information are sufficient to warrant a person of reasonable caution in the belief that evidence of a crime will be found." Id. (quoting Silva, 742 F.3d at 7). "Search of a motor vehicle requires 'particular facts indicating that, at the time of the search, the vehicle or container within it carried contraband,

evidence of crime, or other sizeable matter." Id. (quoting United States v. Infante-Ruiz, 13 F.3d 498, 502 (1st Cir. 1994)).

### III. Discussion

Villar argues that the evidence seized during, and the statements made in connection with, the August 22, 2019 stop should be suppressed because (1) the DEA officers did not have probable cause to believe that he was engaged in drug trafficking and (2) Johnson did not have reasonable suspicion that Villar was operating the Maserati in violation of Mass. Gen. Laws ch. 90 § 9D. The government argues the stop was justified both as a traffic stop and, based on the collective knowledge doctrine, by probable cause.

#### A. *Reasonable Suspicion*

Under Massachusetts law, no person shall operate any motor vehicle upon any public way

> with nontransparent or sunscreen material, window application, reflective film or nonreflective film used in any way to cover or treat the front windshield, the side windows immediately adjacent to the right and left of the operator's seat, the side windows immediately to the rear of the operator's seat and the front passenger seat and the rear window, so as to make such windshield and said window glass areas in any way nontransparent or obscured from either the interior or exterior thereof.

Mass. Gen. Laws ch. 90, § 9D. "[T]he standard to be used in determining the legality of a stop based on a suspected violation of c[h]. 90, § 9D, is whether the officer reasonably suspected, based on his visual observations, that the tinting of the windows exceeded the permissible limits of § 9D." Commonwealth v. Baez, 47 Mass. App. Ct. 115, 118, 710 N.E.2d 1048 (1999).

Johnson's arrest report stated that while he was parked on an exit ramp, he observed the blue Maserati's "window tint to appear below the legal tint level of 35%." Arrest Report ¶ 1 [Doc. No. 191-3]. Villar's motion argues that this is not enough to satisfy the reasonable suspicion standard. At the evidentiary hearing, however, Johnson provided additional testimony

regarding how he arrived at his suspicion, including his knowledge of Massachusetts law regarding window tint and his experience making approximately 100 prior stops based on suspected violations of Mass. Gen. Laws ch. 90, § 9D, almost all of which he then confirmed with his tint meter to be correct. Given this additional information, the stop was reasonable and warranted.

Villar next argues that even if Johnson had formed legally sufficient articulable suspicion to stop him for the suspected traffic violation, further questioning and detention were not justified. Police authority to seize an individual ends "when tasks tied to the traffic infraction are—or reasonably should have been—completed." Rodriguez, 575 U.S. at 354. "Beyond determining whether to issue a traffic ticket, an officer's mission includes 'ordinary inquiries incident to [the traffic] stop.'" Id. (quoting Illinois v. Caballes, 543 U.S. 405, 408 (2005)). Here, after pulling Villar over for a suspected traffic violation, Johnson asked him for his license and registration and, during this exchange, noticed that Villar appeared nervous. While nervousness alone may not have justified a prolonged detention, see United States v. McKoy, 428 F.3d 38, 41 (1st Cir. 2005) ("It is simply not reasonable to infer that a driver is armed and dangerous because the officers believe that he appears nervous and reaches toward the car's console when approached by police even in a high-crime neighborhood"), that was not the only factor: Johnson also learned that the name on the license Villar provided did not match the name associated with the license number and, when he asked Villar if he had anything illegal in the car, Villar gulped and looked at the black backpack on the seat next to him. These observations provided Johnson with "reasonable suspicion of further criminal wrongdoing" so as to warrant him to prolong the seizure and ask Villar to step out of the car. Lee, 317 F.3d at 33. When Villar got out of the car, Johnson noticed both the small, unzipped bag with money in it as well as the small bag in the

pocket of the driver's door containing a brown powder substance. Johnson's assessment, based on his training and experience, that this brown powder was likely heroin or fentanyl allowed for further search of the Maserati pursuant to the automobile. See Cruz-Rivera, 14 F.4th at 43 ("Police have probable cause to search where the known facts and circumstances are sufficient to warrant a man of reasonable prudence in the belief that contraband or evidence of a crime will be found") (internal citation and quotation omitted).

Accordingly, because the initial stop was permissible and, following the stop, Johnson developed reasonable suspicion of further wrongdoing sufficient to prolong the seizure and to allow for a further search of the car, there is no basis to suppress the evidence from the stop, search, and subsequent custodial interviews.

B.   *Collective Knowledge*

Where the court finds that Johnson had reasonable suspicion of a traffic violation to justify the stop, it need not analyze whether there was an independent justification under the collective knowledge doctrine.

IV.   Conclusion

Accordingly, Villar's Motion to Suppress [Doc. No. 186] is DENIED.

IT IS SO ORDERED.

March 30, 2022                                              /s/ Indira Talwani
                                                            United States District Judge

9